ACCEPTED
03-14-00484-CR
7501415
THIRD COURT OF APPEALS
AUSTIN, TEXAS
10/22/2015 3:23:20 PM
JEFFREY D. KYLE
CLERK

NO.  03-14-00484-CR

IN THE

COURT OF APPEALS

OF THE

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
10/22/2015 3:23:20 PM
JEFFREY D. KYLE
Clerk

THIRD JUDICIAL DISTRICT OF TEXAS
--------------------

MICHELLE ELAINE GAMBLES,
                    Appellant

vs.

STATE OF TEXAS,
                    Appellee
--------------------
Appeal from Cause No.  2C13-07485
Bell County Court-at-Law No. Two
--------------------
BRIEF FOR THE STATE
--------------------
JAMES NICHOLS
BELL COUNTY ATTORNEY

Stephen Morris
Assist. County Attorney
P.O. Box 1127
Belton, Texas 76513
Tel: (254) 933-5135
Fax: (254) 933-5150
SBN: 14501700

ATTORNEYS FOR THE STATE

**ORAL ARGUMENT NOT REQUESTED**

**NO.  03-14-00484-CR**

**IN THE**

**COURT OF APPEALS**

**OF THE**

**THIRD JUDICIAL DISTRICT OF TEXAS**
--------------------

**Michelle Elaine Gambles,**
**Appellant**
**vs.**

**STATE OF TEXAS,**
**Appellee**
-------------------
**Appeal from Cause No.  2C10-02955**
**Bell County Court-at-Law No. Two**
-------------------
**BRIEF FOR THE STATE**

-------------------

**TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS:**

Comes now the STATE OF TEXAS, Respondent, hereinafter referred to as the state, and submits this Brief, pursuant to the Texas Rules of Appellate Procedure, requesting that the relief prayed for by appellant be in all things denied.

# IDENTITY OF PARTIES AND COUNSEL

Appellant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**Michelle Elaine Gambles**
1018 Arnold Drive
Bartlett, Texas 76511

Appellant's Trial Counsels. . . . . . . . . . . . . . . . . . . . . . . . . **Michael F. White**
**David Fernandez, Jr.**
Attorneys at Law
100 Kastberg Drive, Suite A
Temple, Texas 76502

Appellate Counsels. . . . . . . . . . . . . . . . . . . . . . . . . . . **Bobby Dale Barina**
**Tyler Woudwyk**
Attorneys at Law
55 East Central Texas, Suite 104
Harker Heights, Texas 76548

Trial Counsel for the State. . . . . .. . . . . . . . . . . . . . . . . . . . . . . . .**Mark Currier**
Assistant Bell County Attorney
P.O. Box 1127
Belton, Texas 76513

Appellate Counsel for the State. . . . . . . . . . . . . . . . . . . . . . . . . .**Stephen Morris**
Assistant Bell County Attorney
P.O. Box 1127
Belton, Texas 76513

Trial Judge. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **Hon. John Mischtian**
Judge, Bell County Court-at-Law No. Two
P.O. Box 485
Bell County Justice Complex
1201 Huey
Belton, Texas 76513-0781

**TABLE OF CONTENTS**

*Page*

Waiver of Oral Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .I

Identity of Parties and Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. III

Table of Contents. . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . ..IV

Index of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . V

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

APPELLANT'S ISSUE NUMBER ONE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

State's Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Argument and Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Prayer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# INDEX OF AUTHORITIES

**I. CASES** **Page**

**FEDERAL**

*Jackson v. Virginia*, 443 UV. S. 307, 318-319,
99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**STATE**

*Barshaw v. State*, 342 S.W.3d 91, 93-94
(Tex. Crim. App. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . 30

*Brooks v. State*, 323 S.W.3d 893, 912
(Tex.Crim.App.2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

*Dobbs v. State,* 434 S.W.3rd 166, 170
(Tex. Crim. App. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27,28

*Gary v. State*, 195 S.W.3d 339
(Tex. App. – Waco 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

*Motilla v. State*, 78 S.W.2d 352, 353-54
(Tex. Crim. App. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Pumpfrey v. State*, 245 S.W. 3d 85
(Tex.App. – Texarkana 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

**II.    RULES**

Tex. R. App. P. 44.2(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

# STATEMENT OF FACTS

The State called Mark Koenig as their first witness. (R.R.Vol. 4, p. 26) He testified that he was employed as a plumber working for My Plumbing Company on September 11, 2013. He and his employer, Michael Young, had just arrived at a service call at 1809 Stardust when they were approached by appellant who lived directly across the street. She accused Michael Young of speeding, as he was the driver of the truck. Mr. Koenig identified appellant as the woman that approached them at the above time and place. (R.R.Vol. 4, p. 31) Appellant appeared to be agitated as she spoke in a loud tone of voice and she was visibly, very upset. (R.R.Vol. 4, p.32-33) She continued to loudly berate Mr. Young to the point that Mr. Young called the police. (R.R.Vol. 4, p. 33) Mr. Young tried to tell appellant to stay back and stay on her side of the street. (R.R.Vol. 4, p. 33-34) Mr. Koenig testified that Mr. Young became somewhat agitated himself, as appellant was keeping them from doing the job they were there to do. (R.R.Vol. 4, p. 34)

Subsequently, after Mr. Young called the police a female officer arrived at that location. The female officer also attempted to calm appellant down. (R.R.Vol. 4, p. 35) The officer asked appellant to lower her voice in an attempt to have a conversation with appellant. The officer continued to speak calmly to appellant in

1

an effort to get appellant to lower her voice. Still, appellant paid no attention to the officer.(R.R.Vol. 4, p. 36)

Soon thereafter a male police officer arrived and began speaking with Mr. Koenig and Mr. Young who were standing in the yard of their customer. At this point in time the male police officer had to direct his attention to the female officer in order to help her get appellant under control. It appeared to Mr. Koenig that appellant wasn't complying with the female officer's instructions. (R.R.Vol. 4, p. 37)

Mr. Koenig stated that at that point in time, he saw the female police officer attempt to arrest appellant. The female officer attempted to handcuff appellant's hands. (R.R.Vol. 4, p. 37) She managed to get one of appellant's hands into the handcuff and as the female officer was trying to control the second hand, appellant jerked her free hand away from the officer. (R.R.Vol. 4, p. 38) As appellant broke free from the female police officer's grasp, both appellant and the female officer dropped to the ground. (R.R.Vol. 4, p. 39)

Mr. Koenig stated that while appellant and the female officer were on the ground appellant still would not comply. (R.R.Vol. 4, p. 39-40) After several attempts to get appellant to comply, Mr. Koenig believes it was at this point appellant was tasered by the male police officer. Appellant still didn't calm down. She continued to be really aggressive. (R.R.Vol. 4, p. 40)

2

Under cross-examination Mr. Koenig stated that he did not talk to either police officer during or after the event took place. He did testify that he heard part of the telephone call his employer made to the Police Department. In answer to the defense attorney's question, during the telephone call he heard the appellant being described as a short black woman. (R.R.Vol. 4, p. 44-45) The witness also heard the caller use the term African American when describing the appellant. (R.R.Vol. 4, p. 46)

Mr. Koenig testified that he did not see appellant strike the officer and saw nothing that indicated that appellant was trying to injure the female officer or the male officer. (R.R.Vol. 4, p. 48-49) Appellant was being loud and waiving her arms around when both police officers were trying to do their job. (R.R.Vol. 4, p. 50)

The witness testified that the when the male officer approached both appellant and the female officer, the female officer had managed to handcuff one of appellant's hands. However, the appellant kept jerking her free hand away. The male officer had come to aid the female officer in an attempt to help her handcuff appellant who was still trying to fight the officers. (R.R.Vol. 4, p. 51)

In answer to appellant's attorney's question, Mr. Koenig stated that he never saw either police officer drive their knees into the middle of appellant's back. Mr. Koenig did see an officer with a black and yellow stun gun. He saw the stun gun used when the officer tasered appellant when she was on the ground. (R.R.Vol. 4, p. 52-53)

3

Mr. Koenig testified that he never observed either of the police officers strike appellant in her side or in the middle of her "gut". (R.R.Vol. 4, p. 53) He did observe that appellant was on the ground and rocking her body when she was tasered one time. (R.R.Vol. 4, p. 53-54) Appellant's reaction was that of being in pain. (R.R.Vol. 4, p. 55)

Sheena Mendez was the next witness called to testify by the State. (R.R.Vol. 4, p. 62) She testified that her parents own a home that is located across the street from the appellant's home. On the date of the offense, Ms. Mendez was at her parent's home to let the plumbers in the house to fix a leaky pipe. (R.R.Vol. 4, p. 63) She testified that at the time she pulled up and was opening her door, she saw the appellant from across the street approaching her. Appellant was yelling that "they" were speeding down the street. Ms. Mendez began to apologize to appellant as the plumbers were there to fix a pipe in her parent's home. The explanation and apology did not appease appellant. (R.R.Vol. 4, p. 64)

Ms. Mendez had let the plumber who had called 9-1-1 and herself into the house while his partner had stayed outside waiting for the police to arrive. (R.R.Vol. 4, p. 65) When the two police officers arrived she went outside and observed a male and a female police officer. (R.R.Vol. 4, p. 52) She saw the female officer go to speak with appellant.(R.R.Vol. 4, p. 67) She heard appellant speaking with the officer in a

4

loud and upsetting voice. It appeared to Ms. Mendez that appellant was angry and upset. (R.R.Vol. 4, p. 69) The female officer told appellant to calm down , then the female officer started to speak with the plumbers.

Appellant continued to be loud and upset. At this point, the female officer told appellant, "if you don't stop and calm down I'm going to have to arrest you." Nevertheless, appellant continued to be loud and upset. The female police officer began to arrest appellant by grabbing Appellant by her arm and putting it behind appellant's back. (R.R.Vol. 4, p. 70) At that point, Appellant was wiggling around just trying to get away. (R.R.Vol. 4, p. 71) Appellant continued to try to break free from the female officer. (R.R.Vol. 4, p. 72)

At this point the male officer realized that the female officer was having issues trying to maintaining control over appellant so he came to assist the female officer. The next thing the witness knew appellant was on the ground. Apparently, the male officer tasered appellant because she was not complying with any of the commands given to her by the female officer. According to the witness, the police officers struggled with appellant for several minutes. (R.R.Vol. 4, p. 73)

After they managed to get appellant in handcuffs, then the officers put appellant into the female officer's police vehicle. At this point in time, appellant was still loud and yelling. (R.R.Vol. 4, p.74-75)

5

At the close of the above witnesses' testimony the state offered the 9-1-1 call as States Exhibit No. 1, that was admitted into evidence without objection. (R.R.Vol. 4, p.83)

The state called Mike Paul Young as their next witness. . (R.R.Vol. 4, p.84), (R.R. Vol.5, p.6)  He testified that he is a licensed plumber and service technician for My Plumbing Company. (R.R.Vol. 5, p.7) . Mr. Young further testified that he was working on September 11, 2013, and arrived at 1809 Stardust for a service call. Both he and Mr. Koenig exited his vehicle and as he did so he heard irate yelling. Initially, he didn't know where the sound was coming from.  However, he then realized that the yelling was coming from the neighbor's yard.  As he looked in the direction of the appellant she said, "Yeah, I'm talking to you."

Mr. Young further testified that he was taken back and really didn't know what was going on. (R.R.Vol. 5, p.8)  Appellant started yelling to him about his driving, however, he just ignored her and proceeded to the door of the customer's house where he was called to repair a pipe. (R.R.Vol. 5, p.9)

The State offered State's Exhibit No. 1, which is the 9-1-1 call Mr. Young made on the date of the offense.  Mr. Young further testified that appellant was present when that 9-1-1 call was made. (R.R.Vol. 5, p.10)  She called Mr. Young, "demoned white devil." Appellant also told Mr. Young that she was going to ask the

6

good Lord to put a whooping on his soul. (R.R.Vol. 5, p. 10) Mr. Young testified that one can call him all the names one wants, but when one wants to put a hex on him it becomes personal. (R.R.Vol. 5, p.11) Just before appellant started the hexing, Mr. Young was asking her to call the police. When she didn't call them, Mr. Young did. (R.R.Vol. 5, p. 11) Mr. Young and Ms. Mendez retreated into Ms. Mendez's parent's home until the police arrived. (R.R.Vol. 5, p.12)

Mr. Young went back outside when Mr. Koenig told him that the police had arrived. He spoke with the male officer, Officer Firebaugh. (R.R.Vol. 5, p.12). Officer Lawson, the female police officer, had begun speaking with appellant. (R.R.Vol. 5, p.14) At this point, Mr. Young identified appellant as the defendant in this case.

Mr. Young testified that he could hear appellant complaining to the female policeman about his driving. It appeared that Officer Lawson was trying her best to get appellant to calm down, but she could not get appellant to be quiet. (R.R.Vol. 5, p.15-16)

Officer Lawson told appellant to stay where she was, then the officer approached Mr. Young in an attempt to get his side of the story. Before Mr. Young could explain anything to the officers, appellant started to approach where he was located and she was yelling and screaming and waiving her arms. (R.R.Vol. 5, p.16)

7

Appellant continued to yell and scream as she proceeded toward Mr. Young. At this point, Officer Lawson stepped in appellant's path and once again told appellant be quiet. When appellant did not, Officer Lawson grabbed appellant. Appellant tried to spin out of the police officer's grasp, then they both went to the ground together. (R.R.Vol. 5, p.17) Appellant then tucked her hands underneath her chest and would not give her hands up after having the police officers repeatedly asked that appellant give up her hands to the police officers. (R.R.Vol. 5, p.17) Officer Lawson had appellant by one arm but the other arm was all over the place. (R.R.Vol. 5, p.17, 18)

Mr. Young further testified that most of the struggle took place on the ground as the Officer Lawson could not subdue appellant. Officer Firebaugh had to leave Mr. Young's position and go to help Officer Lawson subdue appellant. (R.R.Vol. 5, p.19) The struggle lasted a good, solid two to five minutes on the ground. (R.R.Vol. 5, p.21) Appellant continued to yell and continued to refuse to give up her hands. (R.R.Vol. 5, p.23)

Officer Firebaugh, after repeated warnings, advised appellant that he was going to tase her if she did not comply and show the officer her hands. (R.R.Vol. 5, p.23) When appellant still did not comply, the officer drew his taser, put it in appellant's small of the back and tased her.(R.R.Vol. 5, p.23) Officer Firebaugh had to taser

8

appellant again as even after the first tase as she still did not show her hands.  After the second tasering, Officer Lawson finally got hold of appellant's hand and put it behind appellant's back.(R.R.Vol. 5, p.24)

Mr. Young stated that he did not give a written statement at the scene, however, Officer Firebaugh called him later that evening and asked him to make a statement.  A different officer came to his home and delivered a worksheet and the witness filled it out at his home.  Then he brought it back to the police department and left it with the police dispatch. (R.R.Vol. 5, p.25, 26)

Outside the presence of the jury, defense council advised the court that he had not been given a copy of Mr. Young's written statement.  Defense council apprized the trial court that he had made a copy of the "entire file" from the County Attorney's Office and in addition there was no supplemental report referencing the statement from Mr. Young.(R.R.Vol. 5, p.26)

The prosecutor told the trial court that the statement had been in the State's file.  The prosecutor said he did not know why present defense counsel did not copy it.  The trial court asked the prosecutor to make a copy of it and give to defense counsel.  The prosecutor  copied the document and gave it to defense counsel. (R.R.Vol. 5, p. 27-28) In the presence of the jury Mr. Young testified that the day of the offense was the first and only time he had ever seen defendant. (R.R.Vol. 5, p.29)

9

During cross-examination, Mr. Young denied ever calling appellant any name. However, after defense counsel played a portion of the 9-1-1 tape, he did recall that he had called her a witch, as well as a fat black lady. (R.R.Vol. 5, p.30-31) He denied that he told appellant that she was nuts or that she wasn't right in the head. He told the dispatcher at the time he made the call to the police that he could not say if any alcohol or drugs were involved. (R.R.Vol. 5, p.33)

Mr. Young again stated that he didn't know if appellant was on any kind of drugs, as that was the question that the dispatcher asked him. He told the dispatcher that he was not. Mr. Young further stated that he was not on drugs any day. (R.R.Vol. 5, p. 34)

At this point, the jury was retired and defense counsel ask the court to rule that the witness has opened the door in regard s to the State's witness' own use of drugs or alcohol when the witness specifically volunteered that he had not used drugs or alcohol on the day of the offense or any day. (R.R.Vol. 5, p. 35)

After a discussion outside the presence of the jury, the State agreed with defense counsel that the witness had lied to the jury and that defense counsel would be entitled to impeach Mr. Young as to his statement that he never used drugs when in fact he had used drugs. (R.R.Vol. 5, p. 44-45)

At the close of Mr. Young's testimony, the State called as their next witness,

Officer Tonya Lawson. She testified that she is a police officer employed by the Killeen Police Department and has been so for about two and a half years. (R.R.Vol. 5, p. 61)

On the date in question, Lawson was working the 2:00 pm to midnight shift. Lawson received a dispatch to go to 1809 Stardust street in regards to a disturbance call. (R.R.Vol. 5, p. 62) When she arrived on the scene she observed a black female running towards her location. Lawson stopped her vehicle and got out of her patrol vehicle because she didn't know if the appellant was involved in the disturbance or not. The appellant was screaming and Lawson could not at first, understand what she was saying. (R.R.Vol. 5, p. 63) The only thing she could understand was that man there was speeding down her road. Officer Lawson kept trying to calm appellant down because she could not understand appellant.

Officer Lawson was continuing to try to understand appellant but all appellant could do was point to a white male who was next door and yell, "He is speeding." (R.R.Vol. 5, p. 64)

Officer Lawson kept trying to calm the woman down. However, after a couple of minutes of trying, she realized that she couldn't calm her down. So she started to walk to where the male was in the adjacent yard hoping he could tell her what was going on. (R.R.Vol. 5, p. 67)

By the time she started to walk to the male's location, Officer Firebaugh had arrived and he was already speaking with the male. As Officer Lawson started to walk to the location of the male and Officer Firebaugh, she saw that suddenly Officer Firebaugh had started run directly towards her. Officer Firebaugh was running toward appellant because appellant was screaming and charging in the direction of Officer Lawson and the male that was apparently involved in the situation. (R.R.Vol. 5, p. 68)

When Officer Firebaugh arrived at the location of the appellant, Lawson and Firebaugh grabbed appellant's arms. (R.R.Vol. 5, p. 69) At this point, Officer Lawson grabbed the left arm of appellant but appellant immediately pulled away. When appellant pulled away Officer Lawson, Officer Firebaugh and appellant all fell to the ground. (R.R.Vol. 5, p. 70)

While on the ground appellant had both arms under her body and Officer Firebaugh was pulling on her left arm trying get the arm behind appellant's back. Officer Lawson was trying to get appellant other arm behind her back. At some point, Officer Firebaugh managed to get appellant's left arm behind her back. Officer Lawson was continuing to try and get appellant's right arm behind her back. Appellant continued to resist by kicking and screaming. (R.R.Vol. 5, p. 71)

According to the witness it was at this point that Officer Firebaugh tasered

12

appellant.  Officers Lawson and Firebaugh were then able to secure appellant in handcuffs in spite of Appellant's continued kicking and screaming. (R.R.Vol. 5, p. 72)  Then both officers picked appellant up off the ground and started to walk her to the patrol vehicle. (R.R.Vol. 5, p. 73)

At the patrol vehicle they had to search appellant before putting her in the patrol vehicle.   While searching her appellant was still resisting by continuing to kick. (R.R.Vol. 5, p. 75)   On the way to jail Appellant continued to scream and accuse the officers of raping her. (R.R.Vol. 5, p.80)

At the close of Office Lawson's  testimony the state called Officer Johnathan Firebaugh. (R.R.Vol. 5, p.80)  He testified that he is a police officer with the City of Killeen having been employed there for two and a half years. (R.R.Vol. 5, p.139) Officer Firebaugh was on duty on September 11, 2013, when he responded to 1800 block of Stardust. (R.R.Vol. 5, p.141)  He exited his vehicle when he arrived and made contact with the caller.  He saw Officer Lawson trying to talk to a female who was being quite loud in the street.  Officer Lawson was trying to get the female to move to the sidewalk out of the middle of the street. (R.R.Vol. 5, p.144) Officer Firebaugh identified appellant the person he saw with Officer Lawson on that date. (R.R.Vol. 5, p.145)

Officer Firebaugh heard Officer Lawson say to the appellant that she was going

to talk to the individual that the appellant said was speeding down the street. As Officer Lawson started to walk towards Officer Firebaugh, appellant started to fast walk toward the back of Officer Lawson. (R.R.Vol. 5, p.146-147) Officer Firebaugh observed that appellant would be directly behind Officer Lawson in just a few seconds. At that point, Officer Firebaugh quickly made his way toward both Officer Lawson and appellant. When he reached appellant he grabbed her left arm and pulled it behind her back. (R.R.Vol. 5, p.147) Officer Lawson then grabbed appellant's right arm. As soon as Officer Lawson grabbed appellant's arm, appellant jerked, turned and made a punching motion in an attempt to break Officer Lawson's grasp. Then both Officer Lawson and appellant went straight to the ground. (R.R.Vol. 5, p.148)

Appellant continued to scream and she locked both of her arms underneath her. She was face down and she began to kick her feet in the direction of Officer Lawson. (R.R.Vol. 5, p.150) The officers continued to struggle with appellant on the ground. During this time appellant was screaming and talking unrecognizable gibberish. (R.R.Vol. 5, p.151)

After the officers had appellant under control on the ground, appellant refused to stand up. (R.R.Vol. 5, p.151) Both officers had to physically pick her up. (R.R.Vol. 5, p.153)

At the close of Officer Firebaugh's testimony the state rested its case. (R.R.Vol.

14

5, p.191)

The defense called Jessie Gilley their first witness. (R.R.Vol. 5, p.193) When the police officer started to taser the appellant, Ms. Gilley was standing on her porch trying to shove her grandson back into the house. She was about 12 to 15 feet from appellant when the lady cop turned to walk away. The male cop came racing toward the appellant. He grabbed her by both shoulders, twisted her and threw her to the ground. Then the police officer appeared to be up on appellant's mid back. (R.R.Vol. 5, p.195)

Ms. Gilley screamed at the police officer that Appellant just had surgery. Everybody was screaming, using words like fucking nigger, and white trash.(R.R.Vol. 5, p.195) She further testified that she saw appellant being tasered three times by Officer Firebaugh. Ms. Gilley never saw appellant strike or kick either officer. (R.R.Vol. 5, p. 197)

Ms. Gilley said she heard the police calling her white trash and also heard them call appellant a black ass nigger. The witness went on to say that appellant came to her house earlier that day and they were doing Bible study. (R.R.Vol. 5, p. 199-200) She further testified that she and appellant were best friends. (R.R.Vol. 5, p. 201)

Appellant called Tonya Lawson back to the witness stand. (R.R.Vol. 5, p. 217) In answer to defense counsel's question, she testified that she had been advised that

15

she was under the Rule and she could not discuss her testimony with anyone. She further testified that she did speak with Officer Firebaugh and another male. However, she did not discuss this case in any way with anyone. (R.R.Vol. 5, p. 218)

Appellant called Tabitha Michelle Moore as the next witness. She testified that she works for Michael White. She said that during the 10 minute break that had just occurred, she overheard Moore telling a male police officer and the plumber how she answered the questions when she was on the witness stand. (R.R.Vol. 5, p. 219-220) At the close of the hearing on the matter the court denied appellant's request to strike Officer Lawson testimony. (R.R.Vol. 5, p. 224)

Appellant's trial counsel called appellant, Michelle Elaine Gambles as their next witness. (R.R.Vol. 5, p. 226) Appellant testified that on the afternoon in question, she was standing on the sidewalk at 3:30 waiting for the kids to get off the bus. (R.R.Vol. 5, p. 228-229) As she stood there she saw a truck flying across Cora (Street). She could see sparks and just seconds before he came up the road , a little boy had just crossed the street where the truck had passed. (R.R.Vol. 5, p. 229-230)

Appellant saw that the truck had stopped and the driver had gotten out. Appellant spoke to the driver.

"Sir, it is 3:30, Our kids come home at 3:30. Do you realize that you could have that kid that crossed that road? Do you realize that if you would have killed that child, that you would have been taking that

16

child's – you know, taking that child's Life? Do you care about anybody besides yourself? (R.R.Vol. 5, p. 230)

According to appellant, the truck driver responded by calling her a fucking nigger and asking appellant who did she think she was talking to. (R.R.Vol. 5, p. 231) They continued to have strong words, then appellant decided to call the police. She was on the phone to the police when the truck driver told her he already called the police. (R.R.Vol. 5, p. 232)

When the police arrived, appellant tried to explain to the female officer that the truck driver was driving fast through her neighborhood. She told the police officer that there were first graders and kindergarteners who get off the bus there and if the truck driver had been here a few seconds before he did arrive, he would have killed one of the children.

Appellant testified that she did hear the truck driver call her a witch. She further testified that she told the female officer that the truck driver called her a nigger and asked the female officer to make the truck driver to stop calling her a nigger. Appellant testified that the female police officer turned around and called her a nigger. (R.R.Vol. 5, p. 235-236)

Appellant then stated that she was talking to the female police officer when all of a sudden she felt a "boom." She was on the ground and her body started shaking.

17

Appellant then stated that she fibromyalgia. Plus, she had her gall bladder out. She remembered that the male police officer came "flying at her. Because he was running so hard when he shoved appellant down, he shoved appellant into the female police officer. (R.R.Vol. 5, p. 237) The witness then described how the police officer put his knee into her back. She went on to describe where and how the police officer used his taser to shock her. Appellant testified that she still feels the intense pain. (R.R.Vol. 5, p. 238)

Appellant testified that at no time did she hit either police officer. Nor did she bite, scratch, nor strike either one with her elbows or knees. (R.R.Vol. 5, p. 240) Appellant then testified that the pain has not stopped from the tasering and knee strikes to her back. (R.R.Vol. 5, p. 241) At no time did Appellant intend to use force against the police officers. (R.R.Vol. 5, p. 242)

Appellant denied that Officer Lawson tried to calm her down. Appellant stated that Officer Lawson was lying when Lawson testified that she tried to calm appellant down when she first arrived. (R.R.Vol. 5, p. 247-248) Appellant denied that when Officer Lawson grabbed appellant's arm she pulled away and "sqiggled". Appellant said that what was described by Officer Lawson during her testimony was not true. (R.R.Vol. 5, p. 253-254)

Appellant acknowledged that she did know Sheena Mendez in that, she knows

that she is her neighbor but she does not actually know her. (R.R.Vol. 5, p. 254-255) She also acknowledged that Mendez has no animus towards her that she is aware. Further, she has never met Mr. Koenig. She testified that she doesn't know Officer Lawson, Officer Firebaugh or Michael Paul Young. (R.R.Vol. 5, p. 256)

Appellant testified that she went to complain to the police officers about Mr. Young's driving when they arrived. She admitted that she was upset and the police did nothing to try to calm her down. She again stated that Mr. Young called her the N-word and then Officer Lawson called her the N-word. At that point Officer Firebaugh went ahead and tackled her for no reason. (R.R.Vol. 5, p. 256-257)

Officer Lawson was recalled in rebuttal to again testify that she never heard anybody call appellant the N-word. (R.R.Vol. 5, p. 260)

The state called Sheena Mendez as their next witness in rebuttal. (R.R.Vol. 6, p. 6) She testified that she never heard the plumbers that were there, nor the police officers who were called to the scene, call appellant the N-word. (R.R.Vol. 6, p. 5-6) During cross examination Ms. Mendez did affirm that one of the plumbers did call appellant a witch. (R.R.Vol. 6, p. 12)

The state called Aubrey Huckaby as there next witness rebuttal. She testified that she is the training secretary for the Bell County Communication Center. The call center is responsible for 9-1-1 calls that are made within Bell County. (R.R.Vol. 6,

19

p. 256)

She testified that she was asked to look through the center's records of 9-1-1 telephone calls and determine if there were any calls made on September 11, 2013 and whether or not there were calls made from the phone number (254) 458-2924. (R.R.Vol. 6, p. 16 -17)   Ms. Huckaby stated that she was not able to find any calls from that number on that date.  She stated that regardless of whether or not one actually hears a voice, if someone calls the number and it hits the trunk line system, the number is recorded regardless of whether or not one actually hears a voice. (R.R.Vol. 6, p. 18)

On cross-examination, Ms. Huckaby stated again that if someone does not complete the dialing of the 9-1-1, the system will record the unfinished number. (R.R.Vol. 6, p. 20, 21)   At close of Ms. Huckaby's testimony the state rested. (R.R.Vol. 6, p. 21)

The defense called Ms. Gilley to the witness stand in rebuttal.  She testified that the defendant had come into her home and got Ms. Gilly's phone.  Ms. Gilly thought appellant was going to call 9-1-1, or she thought appellant was on the line with 9-1-1. When Ms. Gilly realized the police officer had her phone and was beating her phone on the side walk, she went up to where he was and took her phone back.  As soon as she retrieved her phone, she hit the off button so she could call her husband.

20

(R.R.Vol. 6, p. 22-23)

At close of the witnesses testimony both sides rested and closed. (R.R.Vol. 6, p. 27) After the charging conference and after closing arguments by all counsel, the jury was retired to deliberate. Upon the return of the jury, the verdict of Guilty was read by the judge in open court. (R.R.Vol. 6, p. 71)

## POINT OF ERROR NUMBER ONE

**The evidence is legally insufficient to support the jury verdict as the state failed to establish that appellant intentionally used force against a peace officer or another as required by law.**

## SUMMARY OF ARGUMENT TO FIRST POINT OF ERROR

The evidence is legally and factually sufficient to support the jury verdict as the state did establish that appellant intentionally used force against two peace officers while officers were in the process of arresting her.

## ARGUMENT AND AUTHORITIES

The record is replete with testimony showing appellant knowingly and intentionally prevented and obstructed both police officers from effecting an arrest and search of appellant.

State's witness, Mark Koenig testified the he observed Officer Lawson arrive and try to calm appellant. He further testified that appellant appeared to not comply with any instructions that Officer Lawson was giving.(R.R.Vol. 4, p. 37) Mr. Koenig stated that then he saw Officer Lawson attempt to arrest appellant. She attempted to handcuff appellant's hands. (R.R.Vol. 4, p. 37) Officer Lawson did manage to get one of appellant's hands into one of the handcuffs.

As Officer Lawson was trying to control the second hand, appellant jerked her free hand away from the officer. (R.R.Vol. 4, p. 38) When appellant broke free from the female police officer's grasp, both appellant and the female officer dropped to the ground. (R.R.Vol. 4, p. 39) Even when Officer Lawson was on the ground with appellant, she still would not comply. (R.R.Vol. 4, p. 39-40) After several attempts to get appellant to comply, Mr. Koenig believed it was at this point that appellant was tasered by the male officer, Officer Firebaugh. Appellant still didn't calm down or comply. She continued to be "really aggressive." (R.R.Vol. 4, p. 40)

Mr. Koenig testified that he did not see appellant strike the officer and saw nothing that indicated that appellant was trying to injure the female officer or the male officer. (R.R.Vol. 4, p. 48-49) However, appellant was loud and waiving her arms as both police officers were trying to do their job. (R.R.Vol. 4, p. 50)

Mr. Koenig stated that the when the male officer approached both appellant

22

and the female officer, the female officer had managed to handcuff one of appellant's hands. However, appellant kept jerking her free hand away. Officer Firebaugh did come to aid of Officer Lawson in an attempt to help her handcuff appellant who was still trying to fight the officers. (R.R.Vol. 4, p. 51)

Ms. Sheena Mendez was the next state's witness called to testify.(R.R.Vol. 4, p. 62) She saw the female police officer began to arrest appellant by grabbing appellant by her arm and putting it behind appellant's back. (R.R.Vol. 4, p. 70) At that point, appellant was wiggling around just trying to get away. (R.R.Vol. 4, p. 71) Appellant continued to try to break free. (R.R.Vol. 4, p. 72)

Ms. Mendez heard appellant speaking to the officer in a loud and upsetting voice. It was apparent to Ms. Mendez that appellant was angry and upset. (R.R.Vol. 4, p. 69) The female officer told appellant to calm down , then the female officer started to speak with the plumbers. Appellant continued to be loud and upset. At this point, the female officer told appellant, "if you don't stop and calm down I'm going to have to arrest you." Nevertheless, appellant continued to be loud and upset.

At this point the male officer realized that the female officer was having problems trying to maintaining control over appellant so he came to assist the female officer. The next thing the witness knew appellant was on the ground. Apparently, the male officer tasered appellant because she was not complying with the commands

given to her by the female officer. According to the witness, the police officers struggled with appellant for several minutes. (R.R.Vol. 4, p. 73)

Officer Lawson was trying to get appellant to calm down, but she could not get appellant to be quiet. (R.R.Vol. 5, p.15-16) Appellant continued to yell and scream as she proceeded toward Mr. Young. At this point, Officer Lawson stepped in appellant's path and once again told appellant be quiet. When appellant did not comply, Officer Lawson grabbed appellant. Appellant tried to spin out of the police officer's grasp, then they both went to the ground together. (R.R.Vol. 5, p.17)

Appellant then tucked her hands underneath her chest and would not give her hands up after having the police officers repeatedly asked that appellant give up her hands to the police officers. (R.R.Vol. 5, p.17) Officer Lawson had appellant by one arm but the other arm, "was all over the place." (R.R.Vol. 5, p.17, 18)

Mr. Young further testified that most of the struggle took place on the ground as the female officer could not subdue appellant. The male officer had to leave Mr. Young's position and help subdue appellant. (R.R.Vol. 5, p.19) The struggle lasted a good, solid two to five minutes on the ground. (R.R.Vol. 5, p.21) Appellant continued to yell and continued to refuse to give up her hands. (R.R.Vol. 5, p.23)

Officer Firebaugh testified after repeated warnings, he advised appellant that he was going to taser her if she did not comply and show the officer her hands.

24

(R.R.Vol. 5, p.23) When appellant still did not comply, the officer drew his taser, put it in appellant's small of the back and tasered her.(R.R.Vol. 5, p.23) Officer Firebaugh had to taser appellant again as even after the first taser as she still did not show her hands. After the second taser Officer Lawson finally got hold of appellant's hand and put it behind appellant's back.(R.R.Vol. 5, p.24)

Officer Firebaugh further testified that when appellant was on the ground, appellant had both arms under her body. Officer Firebaugh was pulling on her left arm trying get the arm behind appellant's back. Officer Lawson was trying to get appellant's other arm behind her back. At some point, Officer Firebaugh managed to get appellant's left arm behind her back. Officer Lawson was continuing to try and get appellant's right arm behind her back. However, appellant continued to resist by kicking and screaming. (R.R.Vol. 5, p. 71)

Only after Officer Firebaugh tasered appellant were Officers Lawson and Firebaugh finally able to secure appellant in handcuffs, in spite of appellant's continued kicking and screaming. (R.R.Vol. 5, p. 72) Then both officers picked appellant up off the ground and started to walk her to the patrol vehicle. (R.R.Vol. 5, p. 73) At the patrol vehicle they searched appellant before putting her in the patrol vehicle. While searching her she was still resisting by continuing to kick. On the way to jail appellant continued to scream and accuse the officers of trying to rape her.

25

(R.R.Vol. 5, p. 75)

"The Court of Criminal Appeals has found that, "the terms 'force and 'against' are terms that are not defined by the penal code, and so we interpret those terms in accordance with their ordinary meaning." *Dobbs v. State*, 434 S.W. 3d 166, 171 (Tex. Crim. App.2014)

The sufficiency of evidence to establish the elements of a criminal offense is set out in *Jackson v. Virginia*, 443 U. S. 307, 318-319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under that standard, Texas courts view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson,* 443 U.S. at 318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *See also Brooks v. State*, 323 S.W.3d 893, 912 (Tex.Crim.App.2010). The standard is the same for both direct and circumstantial evidence cases. *Gary v. State*, 195 S.W.3d 339 (Tex. App. – Waco 2006).

The complete statutory elements of the offense of resisting arrest are that a person:

(1.) "Intentionally prevents or obstructs"

(2.) "a person he knows is a peace officer or a person acting in a peace officer's presence and at his direction"

26

(3.) "from effecting arrest, search or transportation of the actor or another"

(4.) by using force against the peace office or another."

*Dobbs v. State,* 434 S.W.3rd 166, 170 (Tex. Crim. App. 2014)

[T]he Legislature would have understood the phrase "using force against the peace officer or another" as meaning violence or physical aggression, or an immediate threat thereof, in the direction of and/or into contact with, or in opposition or hostility to, a peace officer or another. *Dobbs v. State*, *id*. at 171.

As the record reflects multiple times throughout the testimony, there is ample evidence that supports the State's position as well as the jury's verdict that appellant resisted both the officers' attempts to handcuff appellant and later getting appellant into the police vehicle. Clearly, appellant repeatedly refused to give up her hands and she did not comply with the officer's verbal requests that soon became commands when she refused to allow the police officers to handcuff her.

When appellant was intentionally laying with her hands under her chest as the officers repeatedly directed her to give up her hands so they could handcuff her, she knew she or should have known she was resisting arrest. Appellant's actions at that point, indicate that she knew that the police officers had made the decision that she had violated the law and she was under arrest and going to jail. She was consciously

27

aware that she was thwarting any attempt made to make her comply with the officer's instructions.

> We conclude that a use of force "against" an officer must necessarily be in opposition to or in the direction of and/or in contact with, the officer himself, meaning the officer's physical person. A use of force that is against the officer's goal of effectuating an arrest in the sense that it is hostile or contrary to that goal, but that is not directed at or in opposition to the officer, is not covered by the plain terms of the statute.

*Dobbs v. State, id. at* 173.

In the present case, we see precisely what has been described in the *Dobbs* case with the exception that in appellant's case the force is directed squarely at both police officers. The force used by appellant was "against" the two officers and was in opposition to or in the direction of and in contact with the officer's themselves. The use of force was certainly against the officers' goal of effectuating an arrest in the sense that it was hostile and contrary to that goal, and it was directed at or in opposition to the officers. (R.R.Vol. 5, p.p. 71-75) Such conduct is covered by the plain terms of the statute.

Appellant's histrionics, as well as appellant's continued kicking and jerking her uncuffed hand away and free from Officer Lawson, again evinces appellant's intention of not complying with the directions of the officers.(R.R.Vol. 4, p.38)

When Officer Lawson grabbed appellant, she tried to spin out of Lawson's

28

grasp, then they both went to the ground together. (R.R.Vol. 5, p.17) Appellant continued to resist by kicking and screaming. (R.R.Vol. 5, p. 71) Appellant's deliberate and continual refusal to comply with any direction given to her, lead directly to appellant's arrest.

It stretches credulity that appellant's version of the facts form the basis for the argument that appellant's "passive non-cooperation" did not rise to the level of resisting arrest. The claim that there is no evidence that appellant used force against the officers is simply not true, as the preceding excerpts of the record plainly show.

The facts in *Pumpfrey v. State*, 245 S.W. 3d 85 (Tex.App. – Texarkana 2008) are very similar to the facts in the instant case, in that although Pumpfrey was arrested for disorderly conduct, her physical resistance to the police in that case is very similar to the resistance of defendant in the present case.

> "..., Pumpfrey forcefully pulled away from the officer's restraining grasp. Therefore, her conviction must stand. *Pumpfrey*, at 245 S.W. 3d 85 at 91. *supra*. That being said, we add that here, Pumprefy did more than merely pull away from the officer. She jerked , she squirmed, she twisted, she turned, a (R.R. Vol. 4 p.38) and she struggled, all against the officer's efforts to physically restrain her in the process of making an arrest.

The appellate court in *Pumphrey* held that the statute authorizes a conviction for resisting arrest when a defendant actively pulls against an officer's established grasp of the defendant during an arrest attempt. The court also concluded that the

statute is satisfied by evidence of jerking against, turning in circles to resist, twisting and squirming to thwart, and struggling against an officer's efforts to arrest an individual. *Pumpfrey v. State*, id.

## Standard of Review

"In the harm analysis under Rule 44.2(b), is an appellate court required to disregard overwhelming evidence of the Appellant's guilt? The answer is No. We reaffirm our previous holdings that an appellate court can and should consider overwhelming evidence of guilt in a harm analysis.*" Motilla v. State*, 78 S.W.2d 352, 353-54 (Tex. Crim. App. 2002)

> On appellate review, and pursuant to [TRAP] 44.2(b), a non-constitutional error must be disregarded it unless it affects the defendant's substantial rights. This court will not overturn a criminal conviction for non-constitutional error if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or influenced the jury only slightly.

*Barshaw v. State*, 342 S.W.3d 91, 93-94 (Tex. Crim. App. 2011)

## PRAYER

The STATE OF TEXAS prays this Honorable Court affirm the findings and judgment rendered by the trial court and deny all relief sought by State.

Respectfully submitted,
/S/ Stephen Morris

Stephen Morris
Assistant Bell County Attorney
P.O. Box 1127
Belton, Texas 76513
Tel: (254) 933-5135
Fax: (254) 933-5150
SBN: 14501700

ATTORNEY FOR THE STATE

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Brief for the State was this date forwarded in the manner required by the Texas Rules of Appellate Procedure to Mr. Michael F. White and David Fernandez, Attorneys at Law, 100 Kastberg Drive, Suite A, Temple, Texas 76502 and Mr. Bobby Dale Barina and Tyler Woudwyk, Attorneys at Law, 55 East Central Texas, Suite 104, Harker Heights, Texas Suite

**Signed:** October 22, 2015

/S/ Stephen Morris
Stephen Morris
Assistant County Attorney

## CERTIFICATE OF COMPLIANCE

In accordance with Rule 9.4, Rules of Appellate Procedure, I certify that the foregoing brief for the State contains 7,901 words.

/S/ Stephen Morris
Stephen Morris
Assistant County Attorney